UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RIC-MAN CONSTRUCTION, INC.,
a Michigan corporation, MANCINI
ENTERPRISES, LLC, a Michigan limited
liability company, CRSM 7800
LLC, a Michigan Limited Liability
Company, and STEVEN MANCINI,
a Michigan resident,

      Plaintiffs/Counter-Defendants,

v.

RICHARD MANCINI
CONSTRUCTION, INC., a Florida
Corporation, and RICHARD MANCINI,
a Florida Resident,

      Defendants/Counter-Plaintiffs,

v.

LISA MANCINI, a Michigan resident,

      Counter-Defendant.

_____/

Case No. 25-cv-11774

Hon. Mark A. Goldsmith
Magistrate Judge Kimberly G. Altman

**DEFENDANTS/COUNTER-PLAINTIFFS'**
**<u>FIRST AMENDED COUNTERCLAIM</u>**

## FIRST AMENDED COUNTERCLAIM

Defendant/Counter-Plaintiff Richard Mancini ("Counter-Plaintiff" or "Richard") and Richard Mancini Construction, Inc. ("RMC") by his attorneys, Lippitt O'Keefe PLLC, for his Counterclaim against Plaintiffs/Counter-Defendants Ric-Man Construction, Inc. ("RCI"), Mancini Enterprises, LLC ("Mancini Enterprises"), CRSM 7800 LLC ("CRSM 7800"), Steven Mancini ("Steven") and Defendant Lisa Cavaliere Mancini ("Lisa") (collectively with RCI, Mancini Enterprises, CRSM, and Steven, "Counter-Defendants") states the following:

### THE PARTIES, JURISDICTION, AND VENUE

1. Counter-Plaintiff Richard Mancini is an individual and resident of Miami-Dade County, Florida.

2. Counter-Defendant Steven Mancini, Richard's father, is an individual and resident of Macomb County, Michigan.

3. Counter-Defendant Lisa Cavaliere Mancini, Richard's mother, is an individual and resident of Macomb County, Michigan.

4. Counter-Defendant Mancini Enterprises, LLC is a Michigan limited liability company.

5. Counter-Defendant Ric-Man Construction, Inc. is a Michigan corporation with its principal place of business in Sterling Heights, Michigan, and offices in Deerfield Beach, Florida.

6.      This Court has diversity jurisdiction over Counter-Plaintiff's Counterclaim because the amount in controversy exceeds $75,000.00 and there is complete diversity of the parties: Richard, the Counter-Plaintiff, resides in Florida, Richard Mancini Construction, Inc., Counter-Plaintiff, is a Florida Corporation, while all Counter-Defendants and the additional Defendant, Lisa, reside in Michigan. 28 USC § 1332(a).

7.      All parties, except Lisa, have established personal jurisdiction in this Court through their prior appearances in this case. The Court has personal jurisdiction over Lisa because Lisa resides in Michigan.

8.      Venue is proper in this Court because all Counter-Defendants and Lisa reside in Macomb County, Michigan, which is within the jurisdiction of the United States District Court for the Eastern District of Michigan.

## FACTUAL ALLEGATIONS

### A. The Mancini Trusts

9.      The Mancini family business, as described below, involves dozens of trusts that Steven has established and funded (collectively, the "Mancini Trusts"), which hold either commercial real estate or holding companies that own commercial real estate.

10.     Steven manipulates the Mancini Trusts for his own financial gain at the expense of his children, including Richard, who are the legal beneficiaries.

Wv

11.     Although Steven, in his role as grantor, has disclaimed any proprietary interest in the Mancini Trusts, the various Mancini Trusts are used by Steven as part of an elaborate shell game to increase his personal wealth and avoid taxes.

12.     Steven's unlawful conduct includes both the misappropriation of trust assets and the use of the trusts and alter ego companies. These actions should be viewed as direct actions by Steven himself, since he has used the trusts as alter egos and as the sole owners of the numerous companies he created, which have no separate identity from him.

13.     Lisa acts as the "trustee" of the various Children's Trusts Agreements ("CTA") identified in this case. Instead of acting in the best interests of the trusts' beneficiaries, Lisa follows Steven's guidance, resulting in multiple serious breaches of trust and harm to beneficiaries like Richard.

14.     Christina acts as the "trustee" of the Electing Small Business Trusts ("ESBT"). Instead of acting in the best interest of the trusts' beneficiaries, Christina follows Steven's guidance, resulting in multiple serious breaches of trust and harm to beneficiaries like Richard.

15.     The damages Richard has incurred through Steven's manipulation of the Mancini Trusts will be determined through discovery. Currently, at least $25 million was misappropriated or converted by Steven and is being calculated in the Trust Litigation

### B. Steven and Lisa Misappropriate Money Gifted to Richard by Gilda

16.     Steven and Lisa have four adult children: Christina Mancini Catera, Counter-Plaintiff Richard, Sabrina Mancini Daar ("Sabrina"), and Marina Mancini ("Marina").

17.     Like all of her grandchildren, Gilda gave Richard $10,000 every Christmas from the time he was born until he turned 25.

18.     Steven and Lisa transferred the entire $250,000, which was the total amount of Richard's grandmother's gifts over 25 years, into Steven's and Lisa's personal accounts.

19.     When Richard was a minor, Steven and Lisa used the funds to purchase several private aircraft and kept doing so throughout his lifetime.

20.     When Richard asked them about the money his grandmother gave him, Steven and Lisa admitted they had taken the money for their own benefit and promised to pay him the maximum interest rate.

21.     To avoid admitting they stole their children's money, Steven and Lisa started calling the missing funds a "loan" and claimed they were managing Richard's money and paying him the maximum interest rate allowed in Florida, 18 percent.

22.     Therefore, there is no contradiction in Richard's statements that the funds were converted, even though his parents, after admitting the money was gone

5

Wv

and they were responsible, euphemistically called the missing funds a loan, despite none of the children knowing about the loan or being old enough to make a binding agreement.

23.     Richard repeatedly demanded money to buy a primary residence. He specifically demanded the money every year to purchase a residence starting in 2010 up to the present.

24.     Reluctantly, after Richard discovered the loan and demanded the return of the money, he, Steven, and Lisa sent *some* of the funds to Richard's Miami residence in 2015 and again in 2024, implicitly admitting they had converted the funds while leaving a significant "overdue balance."

25.     Notably, Lisa assured Richard multiple times over the years, up until August 2024, that she and Steven planned to repay Richard at the highest legally permitted interest rate or 18% compounded annually under Florida law. In Lisa's recent deposition in the Florida case, Lisa referenced paying Richard "the **best** interest rate." Later, Lisa and Steven changed their stance, claiming the alleged loan was accruing interest at a modest 2 percent simple interest rate.

26.     At no point did Richard agree to lend the gifted funds to his wealthy parents, nor did he agree to give his parents "free" money, as the loan has a near-zero interest rate.

27.     Richard has continued to demand payment from his parents, but to no

6

avail.

### C. *The Mancini Family Business*

28.    Richard Mancini Sr. ("Richard Sr."), Richard's grandfather and Steven's father, founded both a heavy construction company, Ric-Man Construction, Inc. ("RCI"), and a real estate development and management company, Mancini Enterprises, LLC ("Mancini Enterprises"). Richard Sr. passed away in 1993.

29.    In 2005, Steven, Daniel and Edward formed Ric-Man Construction Florida, Inc. ("RCF"). RCF was formed as the non-union alter ego to RCI. In 2015 Steve, Daniel and Edward gave their ownership interest in RCF to their respective children's Electing Small Business Trusts ("ESBT"). The children's trusts of Steve, Daniel and Edward each owned a one third (1/3) interest in RCF.

30.    In 2018, Steven directed Richard to create Richard Mancini Construction, Inc.  ("RMC"). RMC was formed, at Stevens' direction, as a non-union alter ego to RCI, thereby replacing RCF.

31.    From 2018 to the present, RMC has and continues to serve as an alter ego of RCI in Florida. For example, RCI and RMC fail to operate as two distinct entities. Instead, they: share the same accounting team; combine and comingle accounts receivable and accounts payable; transfer employees between the two companies; share employees, including senior management, middle management

Wv

and construction laborers; use the same bonding company, which they use to carry out a bonding program of joint and several liability between RCI and RMC; use the same banking profile and login; share weekly project management meetings; use the same accounting, project management, and payroll software; use the same IT vendor and the same IT server; share the same offices in Sterling Heights, Michigan, Miami Beach, Florida, and Deerfield Beach, Florida; use the same General Contractor Licensor to qualify for Florida projects; have employees enroll in the same 401k plan; conduct business through the same insurance and bonding agent; retain the same attorneys even when their interests do not align; and execute sign permits and subcontracts that are interchangeable between the companies.

32.    Except for the names of the two companies, there is virtually no way to distinguish between them.

33.    From 2020 through its breach of Richard's employment contract in August of 2024, RCI and RMC entered into an agreement under which RMC agreed to perform work in the state of Florida as an alter ego of RCI. In consideration for the work performed, RMC would collect 97.5% of the revenue generated by RCI's Florida contracts.

34.    From 2020 through July 2024, Steven caused RCI to transfer over $15 million to RMC. In approximately August 2024, RCI breached that agreement by converting RCI's 97.5% of more than $5 million in additional revenue, which the

Florida Government authorities released directly to RCI.

35.     Currently, RCI is the parent company headquartered in Macomb County, Michigan. Steven has total, unchecked control over RCI and all RCI's alter ego companies, such as RMC. Steven has full control over RCI's and RMC's bank accounts and causes monies to be transferred among the various alter ego companies. Richard, on the other hand, has view only access to RCI's bank accounts, Richard is unable to transfer, wire, or sign checks on behalf of RCI. Only Steven, Lisa and a single RCI employee, Cynthia Morefield, have the ability to transfer, wire or sign checks on behalf of RCI. Steven uses the various alter ego companies to his own advantage, for example, no matter which alter ego performs the work or where it is done, all payments to the construction companies are sent to RCI's headquarters, where Steven and his assistant decide how to classify and deposit the funds. He then regularly recharacterizes, or mischaracterizes, the funds in whichever way Steven decides is most advantageous for himself and RCI.

36.     For example, RCI obtained projects in the state of Florida. RCI bid on Florida projects from Michigan using RCI Michigan employees, bonded the projects under the parent company RCI, entered contracts in Florida using a Michigan corporation, obtained general contractor insurance coverage, signed Florida contracts in Michigan, and then, to improve its balance sheet, Steven has shifted losses from RCI to its alter ego, RMC. Projects that were bid, bonded, and

Wv

contracted by RCI would show a profit on RCI's financial statements, but the losses would be foisted onto alter-ego company RMC, despite Richard's protests. Despite Steven bidding, bonding, insuring, and contracting on these Florida projects, from Michigan, Steven attempted to manipulate the various companies he controlled, including RMC, in order to improve his personal wealth and the balance sheet and financial wherewithal of RCI.

37.    Steven ultimately controls all Ric-Man and derivative companies, including RMC, and manipulates and moves assets between companies. Therefore, there is no real or legitimate separation among the various construction companies. All the companies are managed by Steven, who makes decisions based on the entire portfolio of companies without considering how each decision affects the individual subsidiaries.

38.    Another example of Steven's manipulation of the alter ego companies is Steven's ability to effectuate payroll for RMC. Not only would Steven shift Florida employees back and forth from RCI and RMC to satisfy local residency requirements on Florida contracts, he would often cause payroll to be delayed or not issued for RCI and RMC employees in Florida.

39.    Steven also had ultimate control over which Florida subcontractors would get paid, for both RCI and RMC. If Steven decided a Florida subcontractor would not get paid, the accounting team for RCI and RMC would not issue

Wv

payments to Florida subcontractors, despite Richard's requests.

40.     Looking further back, the construction and real estate companies have been split by Richard Sr.'s children. The latest split happened during litigation in the Macomb County Circuit Court, Case No. 2017-001318-CB, *Steven Mancini et al. v. Edward Mancini et al.* (the "Mancini Brothers Litigation"). The property interests involved in this case were decided by the settlement agreement that resolved that case.

41.     Richard assisted his father with the Mancini Brothers Litigation, and as a result, he faced periodic, strategic attacks from Edward and Daniel.

42.     At one point, Edward and Daniel attempted to fire Richard because Richard's lack of employment with the Mancini companies would have benefited Daniel and Edward via the partnership agreement. Specifically, the partnership agreement stated, if child of any partner was a full time employee of Ric-Man, the parent of said child could not be bought out under the relevant buy sell partnership agreement.

43.     Fortunately, Steven anticipated their attempt and prepared a letter before his brothers' effort to "fire" Richard, in which he confirmed Richard's lifelong employment and stated that, as Steven had promised *(see infra)*, Richard would take over RCI when Steven concluded his tenure.

**D. Richard's Employment**

Wv

44.     Richard began working for RCI in 1999 when he was 10 years old. He kept working part-time throughout high school, college, and graduate school, including during the summers.

45.     In the early 2000's Steven had his first of many affairs, with a then Ric-Man employee.

46.     At RCI, Richard gained extensive knowledge of tunnel, shaft, caisson, and open-cut construction through his work on RCI's high-risk projects.

47.     Meanwhile, Richard graduated from DePaul University in Chicago in 2011 with a BA in Business. Afterward, Steven suggested that Richard pursue graduate studies in Miami so he could join the full-time MBA program at the University of Miami while also working full-time on a $77 million, high-profile tunnel contract RCI had with the Miami-Dade County Water and Sewer Department.

48.     In June 2013, Richard earned his MBA from the University of Miami, with concentrations in Finance and Real Estate.

49.     In August 2013, Richard and Steven had another falling out, and Steven responded by firing Richard from his positions at RCI, its related entities, and Mancini Real Estate companies.

50.     In 2014, Richard joined Torchlight Investors, a real estate private equity fund based in New York City with offices in Miami.

Wv

51.    In 2015, Steven Mancini had another affair that led him to file for divorce from his wife Lisa, Richard's mother.

52.    In 2016, Richard started working at Fifteen Group, a sophisticated Miami-based real estate investment company.

53.    By late 2016, Richard and his father had not spoken for almost two years. Then in October 2016, Steven approached Richard and asked him to rejoin the Mancini family conglomerate of businesses.

54.    Richard was reluctant to leave his promising career, particularly because of Steven's explosive tendencies with his family members. Steven and Richard had been in more than one physical altercation, Steven does not communicate with at least one of his daughters (and has never met her three children), and Steven and his two brothers (who also worked at the Mancini family businesses) were constantly warring.

55.    To allay Richard's concerns and encourage him to return to Michigan to join the family business, Steven promised Richard guaranteed employment with robust for-cause protections, for as long as Richard would like.

56.    Steven needed Richard to defeat the Ric-Man Buy Sell Agreement which stated no Partner could be bought out of Ric-Man if their child was an employee of the Company. To convince Richard to leave his finance job in Florida, Steven was determined to promise him whatever he could, even if he had no

Wv

intention of following through on those promises.

57.     Steven also promised that Richard would replace Steven's brothers (Daniel and Edward) as Steven's primary partner in the family business, that Richard would hold equity in RCI and all Mancini companies, and that Richard would become the principal and owner of the family conglomerate. In a June 26, 2017, email, Steven noted "the fact that Richard is part of the long term succession plan for Ric-Man."

58.     Considering his father's repeated assurances, Richard made a significant commitment to his family and abandoned his promising career in finance.

59.     Richard would not have left his lucrative position at a prestigious Miami investment firm but for the promises made by his father.

60.     On December 12, 2016, Richard commenced full time employment with Mancini Enterprises, RCI, RCF, RCD, and related Mancini real estate companies pursuant to his agreement with Steven.

61.     Initially, both of Richard's uncles (Daniel and Edward) welcomed Richard back into the fold and praised his job performance.

62.     However, shortly after Richard joined the family businesses, in early 2017, Steven's relationship with his brothers deteriorated.

63.     Under one of the Mancini brothers' preexisting agreement with

14

respect to their partnership, no brother could be bought out so long as his child worked for the family business.

64.     Daniel and Edward, as part of their dispute with Steven, sought to avoid this contractual prohibition by terminating Richard's employment, notwithstanding Richard's superior job performance.

65.     Amid the brothers' ongoing disagreement, Edward contacted Richard to ask whether Richard had any written employment agreement with RCI or RCF.

66.     Contrary to Steven's representations in this litigation, the terms of Richard's and Steven's agreement are documented in several "primary" writings that detail the agreement and reflect both parties' intended final agreement. Where necessary, these documents also satisfy the statute of frauds, as they contain all essential terms of the parties' agreement. The "primary" documents are then copied, referenced, and affirmed in numerous emails and other communications.

67.     On June 29, 2017, Steven sent the following letter memorializing the terms of Richard's employment

Richard,

I am writing this letter to memorialize the terms and conditions under which I offered, and you agreed to accept, just cause employment by Ric-Man, beginning on or about December 2016.

As you recall, in October, 2016, when I approached you about coming to work at Ric-Man, you were employed at Fifteen Group in Miami.  We had multiple discussions over a few months about the terms under which you might consider leaving Fifteen Group and

15

becoming employed by Ric-Man Construction, Inc. and all of its affiliate companies (jointly referred to as "Ric-Man and Mancini Companies").

In reliance on the representations that I made to you as President and Chief Executive Officer of Ric-Man Construction Michigan, Vice President of Ric-Man Construction of Florida and Manager of Mancini Companies.   You agreed to leave your employment with Fifteen Group.  The representations and assurances that I made to you and on which you relied by accepting the position include the following:

1. That your employment would include service to all Ric-Man and Mancini companies, with an emphasis on Ric-Man Florida and Mancini Companies (in Florida).
2. That you would be required to travel around the country as necessary, including Michigan, Florida, Ohio (Painesville) and South Carolina.
3. That you might be expected to travel to Dallas Fort Worth and San Antonio, to take the companies to the next level.
4. That you would be employed at Ric-Man as long as you wanted and that you were being groomed for long-term association with Ric-Man.
5. That you would not be discharged from employment with Ric-Man unless there were good grounds to do so.
6. That you would be employed by Ric-Man at least until I resigned or retired.

Before I made the offer above, I discussed this with Danny and Eddie and they approved.  In light of the current upheaval in the Ric-Man and Mancini companies and Ed's email (attached), I felt it necessary to memorialize in a single writing the salient terms of the agreement that you and Ric-Man and Mancini Companies have reached.

68.    Consistent with Steven's repeated promises that Richard would receive Steven's interest in the Mancini companies, Richard's continued employment in the family business was guaranteed.

16

Wv

69.     For example, the employment agreement specified that Richard "would be employed… as long as [he] wanted," was being groomed for long-term association with Ric-Man," and would be employed by Ric-Man at least until [Steven] resigned or retired."

70.     Although the employment agreement referenced discharge for "good grounds," the understanding of the parties was that "good grounds" far exceeded the protections of a typical for-cause employment agreement and instead required the highest and most severe level of pervasive misconduct or disloyalty to justify any negative employment action.

71.     Steven sent the June 29, 2017, letter memorializing the December 2016 agreement because he was concerned that his brothers (Edward or Daniel) could attempt to interfere with Richard's employment status for the purposes of pushing Steven out of the family companies.

72.     As Steven expected, Edward argued that Richard's employment was governed by the general at-will provisions of the relevant employee handbook rather than the specific terms negotiated between Richard and Steven.

73.     Edward purported to terminate Richard from RCI on August 15, 2017. He also stated that Richard was not an RCF employee.

74.     Daniel admitted in his June 21, 2018, deposition in the Mancini Brothers litigation that he fired Richard to trigger the buyout of Ric-Man.

17

75. Steven argued that his brother's purported termination of Richard was both wrongful and invalid because it violated Richard's employment agreement, under which he was guaranteed employment in the family business.

76. In September 2017, Richard was appointed President of Mancini Enterprises. After a lengthy litigation, Steven and his brothers resolved their dispute and Richard continued at RCI, RDI, and all other family companies, that Steven, Richard and the Trusts had an interest in.

77. No superseding employment agreement involving Richard was executed, and Richard's employment was not validly terminated, so Richard's employment continued to be governed by the December 2016 terms, as memorialized in the June 29, 2017, letter from Steven.

78. The terms of their agreement are documented through several papers, including a long email that Steven wrote to Richard on June 26, 2017, where Steven stated that "...***Richard is part of the long-term succession plan for Ric-Man***." (emphasis added).

79. Steven understood that Richard's employment continued to be governed by the December 2016 terms, as memorialized in the June 29, 2017 letter.

80. Steven once again requested Richard "report to Florida" to restart RCI heavy civil construction operations in Florida and to oversee the Florida real estate.

81. Richard also managed, as President of Mancini Enterprises, LLC, all

Michigan real estate from Florida.

82. In July 2018, at the direction of Steven, Richard founded Richard Mancini Construction, Inc. ("RMC"), a Florida corporation, which became RCI's exclusive subcontractor and alter ego in Florida.

83. On November 3, 2020, an Employment Continuation Agreement was signed by Richard and Steven. The Employment Continuation Agreement confirmed Richard's role as "CFO/Project Manager". The Employment Continuation Agreement also stated Richard "would remain in employment…up to two (2) years after the Death of Steven M. Mancini" for the purpose of "completing all uncompleted projects". This agreement was entered into for the benefit of the bonding company to procure construction bid and performance bonds for RCI.

84. Richard was a Miami-based employee, agent, and representative of Mancini Enterprises, RCI, and RCD from 2016 through 2024, performing many functions and with significant business responsibilities.

85. Until August 2024, Richard served as CFO of several additional Mancini entities and managed Steven and Lisa's personal finances.

### E. Ric-Man Financial Problems

86. After the resolution of the Mancini Brother's litigation, RCI was insolvent and near bankruptcy due to Daniel and Edward's attempts to bankrupt

Steven and RCI, as RCI would be a competitor to Daniel and Edward's construction company in various robust markets across the Country.

87. At the time the bonding company threatened to cut-off all construction bid bonds for RCI and affiliates.

88. At the same time RCI was in default of its loan agreements with Flagstar Bank, triggering multiple negative covenants.

89. Steven was keenly aware of this and on May 3, 2019, when RCI was facing financial problems, Steven sent an email stating **" I anticipate Ric-Man Construction, Inc. will fall into Bankruptcy in the near future"** and urging his wife Lisa, daughter Christina, and Richard to help him develop a business strategy to "protect all of the *joint family businesses*"

90. Steven inappropriately and fraudulently identified the Children's Trusts, Electing Small Business Trusts, and the real estate owned by the various irrevocable Trusts as an opportunity to make RCI solvent again. Steven commenced a scheme in 2019 in which he arranged for real estate owned by the children's trusts to be financed by 3rd-party lenders. The loan proceeds would be improperly transferred and injected into RCI. From 2019 through 2021 Steven caused over $12 million in 3rd party real estate loans to be entered into, the proceeds going through his personal bank accounts and into RCI. From 2019 through 2024, Steven caused over $25 million in trust monies to be injected into

20

Wv

companies Steve claimed to be the sole owner of or were used for Steven's personal benefit. Portions of the $25 million were used to fund Steven's luxurious lifestyle, including paying for his private jet, personal home, ranch in Colorado, care for his horses, and other extravagant expenditures.

91.    From 2019 through today, despite converting over $25 million from the Children's trusts, Steven refused to make distributions to his four adult children six grandchildren.

92.    In other words, Steven is willing to take on the entire burden of hauling away the profits RCI made during the prosperous years. Conversely, during the financially tough years, he prefers to remind the family that they all have a responsibility to the "joint family business" to work together and contribute whatever is necessary to bring the company back into the black.

## F. Richard's Wrongful Termination

93.    On July 26, 2024, Richard, after uncovering Steven's most recent scheme to steal an additional $3 million of trust monies and inject it into RCI, Richard sent Steven a lengthy email outlining Steven's repeated and fraudulent conversion and theft of Trust monies. Richard identified multiple wrongdoings and made multiple requests in this email, but specifically made a demand for Trust accountings, knowing Steven had caused and coerced the theft of over $25 million from the various children's Trusts.

21

94.    Steven responded that he "planned to look into all of Richard's concerns."

95.    Instead, on August 6, 2024, Steven claimed to terminate Richard from RCI and RDI, asserting that Richard was "not an employee, officer, representative or agent of Ric-Man Construction, Inc."

96.    On September 20, 2024, Steven purportedly terminated Richard from Mancini Enterprises.

97.    There was no cause for Richard's termination in 2024.

98.    Instead, Steven informed Richard by email that his employment was "terminated effective immediately." He provided no reason for the termination. However, the timing of the termination matched Richard's complaints about the administration of the trusts and his demands for fair treatment—rather than being used as his father's personal piggy bank.

99.    Reinforcing that the Mancini Trusts are not managed in the best interest of the beneficiaries, Lisa and Christina have refused to make any distributions to Richard since his unjustified removal from the family business.

100.    There is no sufficient legal remedy for Richard's future harms. He is clearly entitled, and justice demands that he be reinstated at Mancini Enterprises, RCI, and RDI.

101.    All conditions precedent to filing this action have been satisfied,

Wv

occurred, or waived.

102. That is, the first time Steven claimed that Richard had been terminated in 2017 was during the current litigation in his defense of Richard's employment claims. However, Steven admits he sent an email to Richard in September 2024 informing him of his termination. The 2024 letter did not mention the supposed 2017 "termination," nor did it indicate that Richard was no longer employed by the company.

103. Steven's position when he wrote the September 20, 2024, email was based on his knowledge that the 2017 "termination" was invalid and has no legal effect, and there was no decision in the Mancini Brothers Litigation related to Richard's employment.

104. Steven knew he had written at least two detailed descriptions of his employment, both of which contradicted the tactical "termination" that Daniel and Edward tried to use to gain an advantage in the litigation.

105. Additionally, Steven knew that RCI and its alter egos had identified Richard as an executive-level employee on numerous bonding applications, project quotations, and other legal and construction documents, where Richard is typically listed as the Chief Financial Officer (or "CFO"). There was no question that Richard was an executive employee of RCI and its various alter egos.

106. Richard is listed as an RCI executive because no one genuinely

23

Wv

believed he was terminated in 2017, especially since Steven confirmed Richard's employment with the company through two detailed written documents. Additionally, if Richard were not an employee, RCI would have been consistently misrepresenting the identity of one of its executive-level employees in official filings to government agencies, bonding companies, subcontractors, and similar entities.

107. It is absurd that a company of RCI's size and reputation would intentionally misrepresent who constituted its chief financial officer, which is responsible for making numerous statements and/or representations in their submissions to bonding companies and local and regional governments, among others.

108. Richard must have worked for RCI and its related entities because no company would willingly take on unnecessary liability from false claims about its decision-makers.

109. Additionally, if Steven truly believed that Richard's employment ended in 2017, he would have had no reason to dismiss Richard again in 2024.

110. No trier of fact could reasonably believe that Richard was terminated in 2017, as Counter-Defendants claim, rather than in 2024, when, outside of litigation, Counter-Defendant Steven sent Richard an email ending his employment.

111.  More specifically, accepting Counter-Defendants' position requires admitting that RCI and/or its alter egos engaged in widespread fraud and submitted false statements to all government authorities involved in every Mancini project since 2017. This is because, before Steven's unlawful actions, including his termination of Richard's employment, Counter-Plaintiff was the Chief Financial Officer, General Manager of the Florida Division, and Project Manager of RCI; President and CEO of RMC; and President of Mancini Enterprises. During this time, Richard was being paid by RCI, RMC, and Mancini Enterprises and pursued a business plan developed in Michigan at RCI.

- RCI has significant business operations in Michigan, where it was licensed in 1965, and in Florida, licensed in 1972. Since the 1980s and continuing to the present, RCI has consistently engaged in construction projects in both states, generating hundreds of millions of dollars in revenue, mostly in Florida.

- For example, in Michigan, RCI has ongoing contracts with various entities, including but not limited to Great Lakes Water Authority ("GLWA"), City of Flint ("Flint"), and Macomb Interceptor Drain Drainage District ("MIDDD"), and collected $45 million in revenue in fiscal year 2024.

- In Florida, RCI maintains ongoing contracts with Miami-Dade County's Water and Sewer Department ("WASD"), along with previous agreements with the City of Miami, City of Miami Beach, and the City of Delray Beach, among other clients in southeastern Florida's tri-county area. RCI has generated several million dollars in revenue in Florida in 2024 alone. Over the past five years, RCI has secured contracts and collected over $20 million in revenue from Florida government agencies.

- Defendant Mancini Enterprises is a real estate development and property management firm that contracts with several Mancini entities, including

25

RCI, RDI, and the Mancini Children's Trust. Through the Mancini Children's Trust, Richard and his siblings hold ownership interests in Mancini Enterprises and numerous other Mancini family entities.[1]

- Mancini Enterprises conducts significant business in Michigan and Florida. For example, Mancini Enterprises manages a large portfolio of commercial real estate in Florida, including about 280,000 square feet of industrial space in Broward County. These properties are mostly owned directly or indirectly by various Children's Trusts.

- In Michigan, Mancini Enterprises manages about 250,000 square feet of real estate. Most of these properties are owned either directly or indirectly by various Children's Trusts.

- Along with his role as a manager and director at RMC, one of several alter egos of RCI, and his 100 percent ownership stake in RMC, Richard also worked as a manager and is an interest holder at Mancini Enterprises through various Trusts where Richard is a Beneficiary.

- From 2019 to 2023, in Florida, Richard printed and signed all outgoing checks for Mancini Enterprises, which operated under the "Mancini Conglomerate" umbrella. During the same period, all incoming rent checks were sent to Florida for deposit, and most Mancini Enterprises employees were based there.

- Finally, most of Mancini Enterprises' real estate portfolio is in Florida, both by square footage (about 55%) and revenue (around 62%).

112. Despite Richard's involvement in all the above-identified businesses, mostly as RCI's top representative, Counter-Defendants argue that Richard was essentially unemployed during this entire time. Their position is not only

---

[1] Counter-Plaintiff Richard and his siblings are the beneficiaries under these Trust Agreements. The individual parties in this case are currently engaged in litigation in Macomb County Probate Court (the "Trust Litigation"). The Trust litigation arises out of Lisa's, Christina's, and Steven's mismanagement of the Mancini Children's Trusts, through which they have siphoned off tens of millions of dollars, all of which belonged to Steven's and Lisa's children, including Richard.

26

Wv

ridiculous, it has no basis in fact.

## COUNT I
## BREACH OF EMPLOYMENT AGREEMENT
### *(Against Steven and RCI)*

113. Counter-Plaintiff incorporates by reference all prior allegations as if set forth in full herein.

114. In December 2016, Steven induced Richard to step away from his lucrative employment with Fifteen Group and begin working for Mancini Enterprises, RCI, RDI, and related Mancini companies in Miami.

115. The binding terms of Richard's employment agreement with Counter-Defendants Mancini Enterprises, RCI, and RDI, memorialized in a June 29, 2017, letter, expressly included employment for as long as Richard preferred, with robust protections from termination.

116. Richard continued to work faithfully and effectively for the family business during his employment.

117. On or about August 6, 2024, RCI and RDI breached Richard's employment contract by terminating Richard.

118. On or about September 20, 2024, Mancini Enterprises breached Richard's employment contract by terminating Richard.

119. Richard has suffered substantial damages as a direct and proximate result of the breach by Mancini Enterprises, RCI, and RDI.

Wv

120. There is no adequate remedy at law for Richard's future harms other than continued employment at Mancini Enterprises, RCI, and RDI.

## COUNT II
## BREACH OF CONTRACT
### *(Against RCI and Steven)*

121. Counter-Plaintiff incorporates by reference all prior allegations as if set forth in full herein.

122. RCI and RMC entered into a valid and binding agreement supported by mutual consideration. Under this agreement, RCI agreed to receive payments on behalf of RMC and was required to transfer all such payments to RMC without withholding any amounts or delaying the transfer.

123. RCI is in material and ongoing breach of its contractual duties. The breach occurred when RCI refused to transfer funds, which it received at RCI's home office in Macomb County, where it was immediately under Steven's control so that Steven was able to disregard the source of the funds and commingle the payment with RCI's other cash receivables. At which point, Steven could use the funds of each of the alter ego companies in whatever manner he chose, even if, as here, such use breached RCI's obligations to RMC, in this case by withholding funds that RMC had earned through its work in Florida.

124. Richard and RMC have repeatedly demanded that RCI transfer the funds, but Steven and RCI have refused to transfer such funds.

28

125.   RCI has refused to transfer the funds causing Richard and RMC to incur substantial damages.

## COUNT III
## COMMON LAW CONVERSION
### *(Against Steven and Lisa)*

126.   Counter-Plaintiff incorporates by reference all prior allegations as if set forth in full herein.

127.   Gilda gifted Richard $250,000 over twenty-five years.

128.   Steven and Lisa exploited Gilda's generosity by depositing the gifted $250,000 into their personal accounts and using it to buy a personal aircraft, among other personal expenses.

129.   Steven and Lisa suggested, falsely, that the funds had been "loaned" to them by Richard at a 2% interest rate, even as Lisa repeatedly assured Richard that the funds were being loaned at the highest interest rate legally permitted or 18% per year for a present value of $21 million.

130.   Richard was not involved in this nonconsensual alleged "loan" of money, which he had been gifted at a near-zero interest rate.

131.   Richard has made repeated demands for the return of the funds, for interest at the promised "maximum" rate, and for other related relief.

132.   Steven and Lisa have exercised wrongful dominion and control over Richard's property to his detriment and are therefore liable for conversion.

133.   Richard has suffered damages because of the acts described herein.

## COUNT IV
## STATUTORY CONVERSION
### *(Against Steven and Lisa)*

134.   Counter-Plaintiff incorporates by reference all prior allegations as if set forth in full herein.

135.   Gilda gifted Richard $250,000 over twenty-five years, which has a present value of $21 million, based on Lisa's statement that in an attempt to mollify Richard, stated that Lisa and Steven would repay Richard the converted funds, plus the best available interest rate on the outstanding balance.

136.   Steven and Lisa exploited Gilda's generosity by depositing the $250,000 gift, which Gilda transferred by issuing check's in the relevant amount so that the funds converted were specifically identifiable. In addition, Lisa and Steven allegedly deposited the funds in an account that contained only the gifted funds, maintaining the specificity and identifiable nature of the converted funds.

137.   Lisa and Steven misused the converted funds for their personal gain, including the purchase of a private aircraft and other personal expenses.

138.   Statutory conversion under MCL 600.2919a(1)(a), as amended in 2005, allows for an award of trebles damages or triple the amount converted: a person who "steal[s] or embezzl[es] property or convert[s] property to the other person's own use…" and is liable for three times the value of the object converted.

Wv

139. Richard never entered into a loan or any other agreement with Steven or Lisa that provided for Steven and Lisa's use of Richard's funds.

140. Steven and Lisa engaged in conduct specifically prohibited by MCL 600.2919a, making them liable for three times the value of the thing converted, i.e., $63 million, or $21 million multiplied by 3.

## COUNT V
## SILENT FRAUD
### (Against Steven and Lisa)

141. Counter-Plaintiff incorporates by reference all prior allegations as if outlined in full herein.

142. With respect to each of the Mancini Trusts that are issue in the Trust Litigation, Lisa, as Trustee, and Steven, as grantor and as co-conspirator with Lisa, had and have a legal obligation to notify the beneficiaries, such as Richard, if any of the trust assets are lost or stolen.

143. It is undisputed that substantial assets in Mancini Trusts have been removed and manipulated by Steven with the assistance of Lisa.

144. Therefore, Steven and Lisa were legally obligated to inform all beneficiaries, including Richard, about each loss, manipulation, or conversion of the trust assets.

31

Wv

145. Steven and Lisa failed to notify the beneficiaries of the Mancini Trusts of any of the losses to or manipulations of the Mancini Trust assets.

146. As a result of Counter-Defendants failure to inform the beneficiaries of the trusts, Richard and the other beneficiaries have incurred substantial losses, with a total in the tens of millions of dollars.

## COUNT VI
## FRAUDULENT INDUCEMENT
### (Against Steven)

147. Counter-Plaintiff incorporates by reference all prior allegations as if outlined in full herein.

148. Steven Mancini fraudulently induced Richard to leave his career in finance in Miami, Florida, to return to work at the family business, the Mancini Companies, stating that he would make Richard his successor, with Richard taking over the position Steven now occupies.

149. When Steven made this statement, he knew that it was false, as he planned to control Richard's conduct by denying Richard the succession if Richard acted contrary to Steven's demands or interests.

150. Steven intended Richard to rely on the statement to induce Richard to return to the family business and execute the lifetime employment agreement.

32

Wv

151.   Richard reasonably relied on Steven's statement because Steven had stated that Richard would be his successor throughout Richard's life. Steven made the statement at the same time he entered into a contract with Richard for lifetime employment.

152.   Richard suffered damages as a result of his reliance on Steven's false statement. In 2024, after demanding that Steven repay Richard the current value of the funds Gilda gifted to Richard as well as tens of millions of dollars that Steven and Lisa took from Richard and his sisters' trust funds (Richard has filed suit in Macomb Probate Court in an effort to force Steven and Lisa to return the vast sums of money they have removed from their children's trust accounts), Steven terminated Richard's employment and filed the current lawsuit against Richard.

## COUNT VII
## PROMISSORY ESTOPPEL
### *(Against Steven and RCI)*

153.   Counter-Plaintiff incorporates by reference all prior allegations as if set forth in full herein.

154.   If the Court finds no contractual relationship, Counter-Plaintiffs are still entitled to recover their reliance damages.

155.   Richard's reliance on Steven's repeated oral and written promises to assist and cooperate in the carrying out of Steven's promise to Richard to hand over leadership of the company, to be completed within a reasonable time after the

Wv

Mancini Brothers divided up the company.

156. Relying on Steven's promise of lifetime employment and his succession upon Steven's stepping down from his full-time leadership role, Richard ultimately decided to leave his career and rejoin the family business.

157. To reenter the family business, Richard gave up a lucrative career in financial services and the flexibility and independence it offered. A career with significant financial compensation. That is, one could adapt to new situations and economies.

158. Steven failed to follow through on his promises when he terminated Richard's employment, and Steven did so for his own nefarious and malicious purposes.

159. When he did so, he caused Richard substantial damage.

## COUNT VIII
### UNJUST ENRICHMENT/QUANTUM MERUIT
### (*Against all Counter-Defendants*)

160. Counter-Plaintiff incorporates by reference all prior allegations as if set forth in full herein.

161. As described above, Steven has received considerable benefits from Richard's commitment to ensuring the RCI and its alter egos maintain the level and quality of work that has led to RCI's past successes and Richard's work as a "fixer"

Wv

wherein he traveled to Ric-Man hotspots to use his expertise and knowledge of all levels of the company to resolve the issue and maintain its reputation.

162.   Had Richard known that Steven planned to cheat him out of the leadership and employment with the RCI and the Mancini Companies, he would not have returned to work for the family business.

163.   Permitting Steven to retain such benefits would create a substantial hardship for Richard.

164.   These benefits include, inter alia, the company's future viability and its ability to relocate its headquarters to Florida and further develop the Florida market, which, over the next 10 or 20 years, will generate hundreds of millions of dollars.

165.   Without Richard's participation, the company would likely have been forced into bankruptcy in 2019-2020, followed by the sale of its assets.

166.   Thus, the future existence of the Ric-Man is due in large part to Richard's efforts in navigating Ric-Man's financial crisis and "bankruptcy" as Steven described.

167.   To the extent that Richard's and Steven's relationship may be deemed not covered by an express contract, the circumstances mandate the implication of a constructive contract to prevent Counter-Defendants' unjust enrichment at Richard's expense.

35

168.   In the interest of justice, the Court should award Richard damages equal to the amount by which Defendants have been unjustly enriched.

WHEREFORE, Counter-Plaintiff respectfully requests that this Court enter a judgment against all Counter-Defendants and Defendant, jointly and severally:

a. Awarding damages for the total monetary value of the injuries Counter-Defendants have caused Counter-Plaintiff to incur;

b. Awarding all pre-judgment and post-judgment interest;

c. Awarding treble damages pursuant to MCL 600.2919a;

d. Declaring that all Ric-Man construction entities, including Richard Mancini Construction, Inc., are alter egos of Ric-Man Construction, Inc.[2];

e. Requiring RCI to obtain an accounting performed by an independent third-party CPA, which is to be provided to Counter-Plaintiff at the same time as RCI receives a copy of the accounting;

f. Awarding all damages Counter-Plaintiff incurred in reliance on Steven's promise of lifetime employment and that Richard would succeed Steven as the head of RCI and all related entities;

g. Awarding all damages resulting from Counter-Defendants' fraud, fraudulent inducement, and/or silent fraud;

h. Awarding compensatory damages and back pay for wrongful termination;

i. Requiring reinstatement of Richard's employment with Mancini Enterprises, RCI, and RMC; and

j. Awarding all additional relief that is just and proper.

---

[2]

36

Wv

Date: June 9, 2026

Respectfully submitted,
LIPPITT O'KEEFE PLLC
*Attorneys for Counter-Plaintiffs*

/s/ Alexander E. Blum
Alexander E. Blum (P74070)
370 E Maple Rd, 3rd Fl.
Birmingham, MI 48009
248-646-8292

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2026, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

*/s/ Alexander E. Blum*
Alexander E. Blum