UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RIC-MAN CONSTRUCTION, INC.,
a Michigan Corporation, MANCINI
ENTERPRISES, LLC, a Michigan Limited
Liability Company, CRSM 7800
LLC, a Michigan Limited Liability
Company, and STEVEN MANCINI,
a Michigan resident,

      Plaintiffs/Counter-Defendants,

v.

RICHARD MANCINI
CONSTRUCTION, INC., a Florida
Corporation, and RICHARD MANCINI,
a Florida Resident,

      Defendants/Counter-Plaintiffs.

v.

LISA MANCINI, a Michigan resident

      Counter-Defendant.

Case No. 25-cv-11774

Hon. Mark A. Goldsmith
Magistrate Judge Kimberly G. Altman

_____/

**DEFENDANTS/COUNTER-PLAINTIFFS'
RESPONSE TO PLAINTIFF/COUNTER-DEFENDANTS'
<u>MOTION TO DISMISS AMENDED COUNTERCLAIM</u>**

i

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES……………………………………………………iv-v

INTRODUCTION …………………………………………………………………1

STATEMENT OF FACTS ………………………………………………………5

LEGAL STANDARD …………………………………………………………...9

ARGUMENT …………………………………………………………………...11

    I.    Plaintiffs' Argument Concerning Defendants'
        Breach of Employment Contract Must Be Rejected
        for Several Reasons…………………………………………………..11

        a.  All Evidence of the Contract and Its Breach Weighs
            in Defendants' Favor …………………………………………..11

        b.  The Doctrine of Judicial Estoppel prevents Steven
            from arguing issues in this case when he has
            previously argued the opposing side in prior
            litigation …………………………………………………………13

    II.    Plaintiffs are Subject to Defendants' Claims for
        Fraudulent Inducement and Promissory Estoppel…………………15

        a.  Michigan law prevents Steven from using the statute
            of limitations to bar Richard's claims………………………..15

        b.  Steven's email, along with the most favorable analysis
            of the Counterclaim, demonstrates that Defendants'
            claims for Fraudulent Inducement and Promissory
            Estoppel should not be dismissed……………………………17

    III.    Defendants' Claim for Conversion is not time-
        barred, and the total damages will be clarified
        through discovery ………………………………………………18

IV.    Defendants' Claims for Breach of Contract
between RMC and RCI and Unjust Enrichment
Are Permissible Based on the Legal Doctrines of
Alter Ego and Shareholder Oppression …………………………20

CONCLUSION ………………………………………………………………...22

## INDEX OF AUTHORITIES

<u>Cases</u>

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 9, 10

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 9

*Bovee v. Coopers & Lybrand C.P.A.*,
    272 F.3d 356 (6th Cir. 2001) ................................................................... 10

*Browning v. Levy*,
    283 F.3d 761 (6th Cir. 2002) ................................................................... 13

*EEOC v. Dave's Detailing, Inc.*, 2008 U.S. Dist.
    LEXIS 36202 (W.D. Ky. May 1, 2008)....................................................14

*Eitel v McCool*,
    782 F.2d 1470 (9th Cir.1986) ................................................................... 9

*Foodland Distributors v. Al-Naimi*,
    220 Mich. App. 453 (1996) ...................................................................... 20

*Hi-Way Motor Co. v. Int'l Harvester Co.*,
    398 Mich. 330 (1976) ............................................................................... 17

*New Hampshire v. Maine*
    532 U.S. 742 (2001) ................................................................................. 14

*Reynolds v. Comm'r*,
    861 F.2d 469 (6th Cir. 1988) ................................................................... 14

*SCD Chemical Distributors, Inc v. Medley*,
    203 Mich. App. 374 (1994) ...................................................................... 20

*Sutton v. Metro. Gov't of Nashville and Davidson Cnty.*,
    700 F.3d 865 (6th Cir. 2012) ................................................................... 10

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) .................................................................................... 9


## **Rules**

Fed. R. Civ. P.  8 ................................................................................................... 9

Fed. R. Civ. P.  12(b)(1)  .................................................................................... 10

Fed. R. Civ. P.  12(b)(6)  ............................................................................ 4, 8, 10


## **Statutes**

MCL 450.1489  ..................................................................................................... 20

MCL 600.5855  ................................................................................................. 4, 15

**INTRODUCTION**

Plaintiffs/Counter-Defendants' ("Plaintiffs") Motion to Dismiss Amended Counterclaim (the "Motion" and "Brief") should be denied entirely because each of the Defendants' causes of action is supported by detailed factual allegations. As shown in this Response, Defendants have thoroughly addressed Plaintiffs' Motion, as each cause of action is supported by a comprehensive factual basis as to each element of each claim. Defendants' factual allegations even include details demonstrating how Plaintiffs' position has changed over time.

First, it is evident from the content of the Motion and Brief in support that Plaintiffs' Motion mainly focused on Defendants' silent fraud claim, asserting it should have been filed in the ongoing probate litigation. Due to Plaintiffs' inconsistent and overly aggressive desire to litigate this claim in probate court, and since the claim was not essential to the issues in the current lawsuit, Defendants agreed to voluntarily dismiss Count V for silent fraud. In doing so, Defendants alleviated Plaintiffs' urgent insistence and rendered approximately 8 of the 25 pages of Plaintiffs' Brief moot, specifically pages 1-3 and 21-25.

The reasons for denying Plaintiffs' Motion are clear. Among other reasons, Defendants have provided detailed explanations supporting each cause of action, describing Plaintiffs' wrongful conduct and their motives in detail; Plaintiffs' false claim that the millions of dollars they took from their children was not conversion

but a loan, which no one knew about at the time the alleged loan occurred and which has not been repaid to date. Plaintiffs' excuse was fabricated afterward to justify the disappearance of Defendant Richard Mancini's ("Richard") funds.

Regarding Plaintiff Steven Mancini's ("Steven") breach of the employment agreement, Plaintiffs' only supporting evidence is Steven's brothers' strategic attempt to terminate Richard during the litigation between Steven and his brothers, Daniel and Edward. *Mancini, Steven M. et al. v. Mancini, Daniel C. et al.*, Case No. 2017-001318-CB (the "Mancini Brothers' Separation Litigation") and *Ric-Man Construction, Inc. v. Richard Mancini*, Case No.2017-3151-CZ (the "Declaratory Judgment Litigation"). The Declaratory Judgment Litigation was filed by Edward and Daniel for the purpose of obtaining a court order validating their termination of Richard's employment. Like the Mancini Brothers' Separation Litigation, this case was also resolved before the court issued an order on the validity of Daniel and Edward's action. At that time, Steven strongly contested the alleged termination in both cases and drafted an email outlining the terms of Richard's employment to oppose Daniel and Edward's plans.

Ultimately, no court ever ruled on the issue, and the dispute was resolved through a confidential settlement agreement. Therefore, the only "evidence" in Steven's favor is inconclusive, and at the time Daniel and Edward tried to terminate Richard's employment, Steven was attacking the validity of the purported

4900-4377-3119, v. 1

2

termination in every way possible. As the attempted termination was never validated or affirmed, Richard continued working for Ric-Man Construction, Inc., Mancini Enterprises, LLC, and all "Mancini Companies."

When Steven breached Richard's employment agreement, Richard found out that Steven's promise to make him the successor of the Family Conglomerate was just another lie when Steven fired him from Ric-Man Construction, Inc., as detailed below. This lie was especially important because Steven used it to induce Richard to leave his career in Florida, move back to Michigan, and accept a position in which he was employed by all Ric-Man companies, which he was intended to maintain during the Mancini Brothers' Separation Litigation.

In fact, Steven had no intention of following through on any of his promises regarding Richard's employment. Yet, just as Steven intended, Richard relied on Steven's promises and started working for the Family Conglomerate. Steven admits Richard's reliance on an email describing the terms of the Parties' Agreement. *See* RCF No. 42 at pp. 15-16.

Steven's email also warns Richard that Daniel and Edward may try to terminate his employment, but such an attempt would have no legal effect. RCF No. 42 at pp. 15-16. He has taken the opposite position in the current litigation. Therefore, the doctrine of judicial estoppel bars Steven's argument, and the deliberate concealment of his misrepresentations to Richard exposes Plaintiffs to the

doctrine of Fraudulent Concealment, MCL 600.5855, which overrides the general statute of frauds when a party actively conceals their fraud, giving the injured party 2 years from the date of discovery to file fraud claims.

Unlike Steven's claims, which are based on his bad-faith interpretation of reality, Richard's claims are firmly grounded in facts and aim to address the most serious wrongs Steven has committed, resulting in harm to Richard and his siblings. Richard's Counterclaim and this Response reveal an astonishing story of his parents' attack on his assets. Among other things, the Plaintiffs have stolen hundreds of thousands of dollars gifted to Richard by his grandmother; in ongoing trust litigation, Richard has found that Steven stole millions of dollars from the children's trust funds; and Steven has destroyed Richard's career in finance through his false promises to get Richard to help him with his dispute against Daniel and Edward in the Mancini Brothers' Separation Litigation.

The facts outlined in the Counterclaim, interpreted in the light most favorable to Defendants, in conjunction with Steven's emailed recitation of the Parties' contract, demonstrate that Plaintiffs' Motion does not come close to meeting the requirements for dismissal under Rule 12(b)(6). In fact, on several issues, the Motion likely places Plaintiffs in a worse position than they were before the Motion was filed. And the only indisputable fact that Plaintiffs have proven is that each of the Counterclaims' causes of action is subject to numerous questions of fact that must

4

be decided during discovery.

## STATEMENT OF FACTS

*Plaintiffs' Conversion of Funds Gifted to Richard*

The funds that Plaintiffs converted consisted of annual gifts of $10,000, which Richard received from his grandmother. ECF No. 42 at p. 5. Richard repeatedly inquired about the funds until Steven and Counter-Defendant Lisa Mancini ("Lisa") finally admitted they had taken the money for their own benefit and promised to repay it to him at the highest interest rate. *Id*. In addition to promising repayment, to avoid admitting they stole their children's money, Steven and Lisa referred to the missing funds as a loan and claimed they were managing Richard's money, while paying him the maximum interest rate allowed in Florida of 18 percent. *Id*.

Because his parents tried to hide the reason for taking the funds from Richard's account, there is no contradiction in Richard's stance or his statements that the funds were converted. However, it should be noted that his parents refused to admit the funds were converted and instead called them a loan. *Id*. at pp. 5-6. Therefore, there is no reason to dismiss the case since Richard is merely pointing out the "euphemism" his parents used when referring to the converted funds. *Id*. at p. 6.

Despite the above misrepresentations, the money has not been returned, and Richard still does not know what actions his parents have taken to cover up the original conversion or to repay the stolen amount, along with various other aspects

4900-4377-3119, v. 1                                    5

of their illegal conduct. Id. Therefore, he has not yet "discovered" the full extent of his parents' conversion, and no statute of limitations has started to run.

*Steven's Breach of Richard's Employment Agreement*
*And the Disclosure of Steven's Fraudulent Promise to*
*Make Richard his Successor*

Richard started working for RCI in 1999 when he was 10 years old. He continued working part-time throughout high school, college, and graduate school, including during the summers. ECF No. 42 at p. 12. In 2011, Richard left Michigan to attend DePaul University in Chicago. After graduating, he moved to Florida to enroll in the University of Miami's MBA program. *Id*.

In June 2013, Richard earned his MBA with concentrations in finance and real estate. *Id*. In August 2013, Richard and Steven had another falling out, and Steven responded by firing Richard from his positions at RCI, its related entities, and Mancini Real Estate companies. *Id*.

Thereafter, Richard pursued a career completely separate from his father and Ric-Man Construction Inc. In 2014, he joined Torchlight Investors, a real estate private equity fund based in New York City with offices in Miami. *Id*. at p. 12. In 2016, after Torchlight Investors closed its Miami office, Richard moved to another prestigious firm, Fifteen Group, a sophisticated Miami-based real estate investment company. *Id*. at p. 13.

In 2016, after not speaking for nearly two years, Steven contacted Richard to

ask him to rejoin the Family Conglomerate. Richard was hesitant to return and leave his career in Miami. In acknowledgment of these facts, Steven promised Richard lifetime employment and that he would become his successor. The true reason Steven wanted Richard back was to counter the Ric-Man Buy Sell Agreement, which stated that no Partner could be bought out of Ric-Man if their child was an employee of the company. Therefore, by returning to work at Ric-Man, Richard would prevent Daniel and Edward from purchasing Steven's interest in Ric-Man. *Id*. at 13-14. Relying on Steven's repeated assurances, Richard made a significant commitment to his family and gave up a promising career in finance. Richard would not have left his position in Miami if not for Steven's promises. *Id*. at 14.

Shortly after Richard resumed working for Ric-Man and all Mancini Companies, the brothers began the initial stages of their separation. However, their discussions grew so heated that Steven filed suit in Macomb County Circuit Court, seeking the Court's ultimate authority to divide the business fairly. *Id*. at p. 17. During the litigation, Daniel and Edward tried to fire Richard and even initiated a separate suit against Richard, Macomb County Case No. 2017-3151-CZ, in an attempt to obtain a declaratory judgment, stating that Richard was lawfully terminated on August 15th, 2017. And, throughout the entire process, Steven strongly defended Richard's employment, arguing that his brothers' attempted termination was ineffective and solely to trigger the buy-out. *Id*.

Both cases settled without the Court ever issuing an order on whether the tactically motivated attempt was valid or not. *Id*. Since Steven had vehemently opposed the validity of the attempted action, stating it had no effect on Richard's employment, there was no reason to question whether Steven believed Richard was still employed after the litigation. Steven said nothing about any termination and continued to treat Richard exactly as he had before the lawsuit, even directing him to go to Florida to open a new business, as an alter ego to Ric-Man, since Daniel and Edward had received the Florida company as part of the settlement. Richard continued to be paid by the Mancini Companies for his work in the usual manner.

Simply put, before Steven terminated Richard's employment in 2025, there was no question that Richard was an employee. Steven's current actions are solely driven by the ongoing litigation and by his fear of being held liable for breaching a lifetime employment agreement, which could result in significant damages.

The facts at issue in this case strongly favor Richard, even when viewed in the light most favorable to the Defendants. Therefore, these facts go well beyond what is necessary to dismiss under Rule 12(b)(6). The Court should deny Plaintiffs' Motion as a waste of time and judicial resources.

**LEGAL STANDARD**

The Federal Rules of Civil Procedure encourage liberal "notice pleading" at the outset of litigation to support the strong policy favoring decisions based on the merits. *Eitel v McCool*, 782 F.2d 1470, 1472 (9th Cir.1986); 6 *Moore's Federal Practice* para. 55-05[2], at 55-24 to 55-26. Therefore, the Rules specify that courts should "freely give leave" to requests for amending pleadings so that judicial decisions are based on the facts of the case. The rules support a liberal right to amend pleadings to include factual allegations that meet the elements of a specific cause of action. Still, the pleadings must include "a short and plain statement of the claim showing that the pleader is entitled to relief," Rule 8(a)(2).

Under Supreme Court precedent, this means the complaint (or counterclaim) must contain enough factual allegations to make the pleader's right to relief plausible. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Because federal courts and the Rules favor decisions based on the case facts, which are uncovered through flexible discovery procedures, by the time a case is ready for summary judgment, the main dispute has been clearly presented for the court to review. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002) notes that the "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to identify disputed facts and issues and to dismiss unmeritorious claims."

4900-4377-3119, v. 1

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of the complaint regarding whether it states a claim upon which relief can be granted.  When deciding a motion under this Rule, a "court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true..." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001). For example, construing the allegations in the complaint means that, if two opposing inferences can plausibly be drawn from the alleged facts, the Court's obligation is to construe the complaint according to the inference that is more favorable to the plaintiff. *Sutton v. Metro. Gov't of Nashville and Davidson Cnty.*, 700 F.3d 865, 873 (6th Cir. 2012).

Further, a complaint can only be dismissed under Rule 12(b)(6) when it does not plead "enough facts to state a claim to relief [that is] plausible…" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In reviewing the plaintiff's allegations, the Court must undertake "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

With respect to the present case, Plaintiffs' Motion falls far short of its burden under Rule 12(b)(6).

Plaintiffs reference to Rule 12(b)(1) applied to its argument over silent fraud, which has been rendered moot due to the parties dismissal of Count V.

# ARGUMENT

**I.      Plaintiffs' Argument Concerning Defendants'
Breach of Employment Contract Must Be Rejected
for Several Reasons.**

**a.  *All Evidence of the Contract and Its Breach Weighs
in Defendants' Favor.***

Steven's single challenge to the Defendants' Breach of Contract claim depends on a purported termination that his brothers Daniel and Edward attempted to carry out to gain a strategic advantage in a prior lawsuit, referred to above as the Mancini Brothers' Separation Litigation. Although Steven now claims that his brothers terminated Richard's employment, he initially strongly opposed their attempt to do so, in an effort to gain an advantage in the lawsuit.

Steven presented his argument in a contemporaneous writing to Richard, assuring him that any attempt by Daniel and Edward against Richard's employment is illegal and unenforceable. Steven confirms he had previously discussed Richard's employment with Daniel and Edward, and they had no objections. He also outlines the key aspects of Richard's employment agreement.

1.  That your employment would include service to all Ric-Man and Mancini companies, with an emphasis on Ric-Man Florida and Mancini Companies (in Florida).
2.  That you would be required to travel around the country as necessary, including Michigan, Florida, Ohio (Painesville) and South Carolina.
3.  That you might be expected to travel to Dallas Fort Worth and San Antonio, to take the companies to the next level.
4.  That you would be employed at Ric-Man as long as you wanted and that you were being groomed for long-term association with Ric-Man.
5.  That you would not be discharged from employment with Ric-Man unless there were good grounds to do so.
6.  That you would be employed by Ric-Man at least until I resigned or retired.

4900-4377-3119, v. 1                                      11

*See* RCF No. 42 at pp. 15-16.

Therefore, based on Steven's own statements, which amount to a party admission at the very least, and more importantly, Steven's support for Richard's continued employment as reflected in his written communications, this entire line of argument must be barred under the doctrine of judicial estoppel.

Steven goes even further by admitting that he knows Richard relied on his promises when he left his job in Florida and joined Ric-Man under the employment terms Steven assured him of.

> In reliance on the representations that I made to you as President and Chief Executive Officer of Ric-Man Construction Michigan, Vice President of Ric-Man Construction Florida and Manager of Mancini Companies. You agreed to leave your employment with Fifteen Group. The representations and assurances that I made to you and on which you relied by accepting the position include the following:

*Id*.

Contradicting the argument in Plaintiffs' Brief against Defendants' claims of fraudulent inducement and promissory estoppel, Steven admits that he made the "representations and assurances" listed above. Notably, he also admits that he knew Richard relied on Steven's promises when "you accepted the position [at Ric-Man]." Overall, Steven's party admissions have supported Richard's claims for fraudulent inducement and promissory estoppel. Additionally, Steven has shown that, at the time his Complaint states that Richard's employment was terminated, he was advocating for Richard against Daniel and Edward, and he wrote the letter to "memorialize the terms" that cover Richard's employment agreement. *Id*.

Steven continues to describe how he approached Richard to ask him to return

4900-4377-3119, v. 1                           12

to Michigan to work at the Ric-Man companies, since he knew Richard had a good career in Florida. *Id*. They discussed the terms of an agreement that Richard would need to be convinced to give up his life in Florida. Finally, Steven assured him that he would be employed by "Ric-Man Construction, Inc. and all of its affiliate companies." *Id*.

Regarding how these promises were fulfilled and the course of Richard's employment, these are issues for the parties to explore in discovery—unless they are barred by judicial estoppel. The evidence, viewed in the light most favorable to Defendants and with all reasonable inferences drawn in their favor, prevents the dismissal of any of Defendants' claims. The limited legal theories Plaintiffs attempt to advance in their Motion are overshadowed by the weight of evidence favoring Defendants—evidence that addresses nearly every issue in the Counterclaim, much of which ultimately stems from Steven's own actions.

**b. *The Doctrine of Judicial Estoppel prevents Steven from arguing issues in this case when he has previously argued the opposing side in prior litigation.***

The Sixth Circuit Court of Appeals has examined the doctrine of judicial estoppel in numerous cases. While each case's facts vary, judicial estoppel "preserves the integrity of the courts by ***preventing a party from abusing the judicial process through cynical gamesmanship***." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) (emphasis added). The Sixth Circuit describes judicial estoppel as a rule

against "playing fast and loose with the courts," "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too." *Reynolds v. Comm'r*, 861 F.2d 469, 472 (6th Cir. 1988) (citations omitted) (alteration in original). In the Sixth Circuit, judicial estoppel prevents a party from (1) asserting a position that contradicts one previously taken under oath in a prior proceeding, where (2) the prior court adopted the opposite stance either as a preliminary matter or part of the final judgment.)

While the doctrine is fair, over the past several years, courts across the country have increasingly used the doctrine of judicial estoppel. This is one tool courts employ to address the rising number of cases, especially litigious individuals who are almost certain to take conflicting positions based only on the meritless lawsuits they file.

> …the court noted that the standard for review in the Sixth Circuit is de novo. Judicial estoppel in this context has three elements: 1) the plaintiff took a contrary position in the bankruptcy court, 2) the bankruptcy court relied on that position, and 3) the contradiction was not based on inadvertence or mistake. Here, the only issue was the third element which requires showing that "(1) the plaintiff had knowledge of the efacts underlying the undisclosed claims; (2) the plaintiff had motive to conceal the undisclosed claims; and (3) the omission was made in bad faith."

*EEOC v. Dave's Detailing, Inc.*, 2008 U.S. Dist. LEXIS 36202 (W.D. Ky. May 1, 2008). As the Supreme Court held in *New Hampshire v. Maine*, the doctrine aims to protect the integrity of the judicial process by preventing parties from changing their

positions based on immediate circumstances. 532 U.S. 742, 749 (2001).

Based on the legal standards courts use to determine whether to apply judicial estoppel, the facts of this case clearly show that the doctrine is applicable: Steven benefited from his advocacy of Richard's employment in his lawsuit with Daniel and Edward, yet now that the purported termination will assist Steven, he has adopted the opposite position, namely that Daniel and Edward's ineffective attempt at termination was actually a valid and enforceable act, cutting off Richard's employment with company in 2017.

It is obvious that Steven's change of heart is motivated by legal gamesmanship. Parties cannot be permitted to engage in this bad faith, duplicitous litigation as such conduct undermines the court's ability to render just and fair decisions.

II.   **Plaintiffs are Subject to Defendants' Claims for Fraudulent Inducement and Promissory Estoppel.**

a.   *Michigan law prevents Steven from using the statute of limitations to bar Richard's claims.*

MCL 600.5855 - Fraudulent concealment of claim or identity of person liable; discovery. Provides as follows:

> If a person who is or may be liable for any claim *fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after*

> ***the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim*** or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations. (emphasis added).

Given the numerous false statements, bad faith, and other misleading actions Steven has engaged in, it is understandable that he may have lost the six-year statute of limitations for fraud. Fraudulent concealment becomes evident upon closer review of the July 2017 email. At no point does Steven explicitly state that he promised to make Richard his successor. He comes very close, so close that it's hardly a coincidence he omits the relevant language.

> At line 4, Steven writes: "That you would be employed at Ric-Man as long as you wanted and that you were being groomed ***for long-term association with Ric-Man***." RCF No. 42 at pp. 15-16. (emphasis added).

> And in line 6, Steven writes: "That you would be ***employed by Ric-Man at least until I resigned or retired***." *Id*. (emphasis added).

Steven emphasizes key words like long-term, lifetime, until I resign or retire, but none of these statements give Richard any rights beyond the expectation that he will work at the company for a long time. There's little doubt that Steven's reason for breaking down the language this way is to hide the fact that he has never intended to make Richard his successor. If he had, why didn't he say so clearly in the 2017 letter? The answer is simple: after making the promise to induce Richard to leave Florida, he engaged in a campaign of fraudulent concealment to prevent Richard from discovering that Steven never planned to make him his successor.

4900-4377-3119, v. 1

16

By actively concealing the fraud in his fraudulent inducement, Steven waived the right to rely on the standard 6-year statute of limitations. Instead, his actions created a "constructive" discovery rule, allowing Richard to file a fraud claim within 2 years of discovering Steven's fraudulent inducement.

In other words, the proper way to analyze the statute of limitations is not from the time Steven defrauded Richard, but from the time Richard discovered the fraud. This clarifies that the statute of limitations does not prevent Richard's claims, as we filed the Counterclaim within the extended two-year statutory period.

        **b.**  ***Steven's email, along with the most favorable analysis of the Counterclaim, demonstrates that Defendants' claims for Fraudulent Inducement and Promissory Estoppel should not be dismissed.***

To succeed in a claim of fraudulent inducement, a plaintiff must demonstrate the following:

> (1)    that the defendant made a material misrepresentation; (2) that was false; (3) that when he made it he knew that it was false, or he made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that the plaintiff acted in reliance upon it; and (6) that the plaintiff was injured as a result.

*Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330 (Mich. 1976) (citation omitted). Steven's letter, which describes in detail the promises he made, along with the factual allegations in the Counterclaim, completely refutes Plaintiffs' claims that the promise was too vague to support claims for fraudulent inducement or

promissory estoppel, and that Richard's reliance on the promise was improper or otherwise insufficient. Based on his father's statements that align with the allegations in the Counterclaim, Steven clearly believes that Richard's reliance on his promises is appropriate and legally justified.

In fact, since the email was also partly written in anticipation of an attack on Richard's employment, Steven made sure to frame his promises in a way that kept the truth and accuracy of his statements while ensuring the email could withstand any challenge to its parts.

Given Steven's email outlining the Parties' contract and the supporting allegations in the Counterclaim, and interpreting everything most favorably to the Defendants, the Plaintiffs' claims of fraudulent inducement and promissory estoppel should be dismissed as legally insufficient, based on the facts alleged by Richard, which include Steven's email as a written record of the Parties' agreement.

### III. Defendants' Claim for Conversion is not time-barred, and the total damages will be clarified through discovery.

The statute of limitations does not bar the defendants' claim for conversion because their parents fraudulently concealed their conversion. Therefore, the doctrine of fraudulent concealment overrides the usual six-year limitations period and establishes a new two-year period beginning when the injured parties discover the fraud. In this case, due to Steven's and Lisa's ongoing fraudulent concealment,

Richard and the other injured parties have not yet become aware of several essential aspects of their parents' fraud.

Once again, fraudulent concealment overrides the standard statute of limitations in the following cases:

> If a person who is or may be liable for any claim *fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim* or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations. (emphasis added).

Among other issues, Steven's and Lisa's ongoing lies and misrepresentations—including their denial that the money was taken, their refusal to disclose how the money was spent, and their current false claim that the conversion was actually a loan—amount to fraudulent concealment and prevent dismissal of the conversion claim based on the statute of limitations.

Based on Steven's and Lisa's attempt to shield themselves from liability through the use of various fraudulent statements, the Defendants do not know the total damages at this time. However, the present value of the $250,000.00 gifted to Richard by his grandmother is at least $21,000,000.00, which would then be trebled because it was converted. Therefore, the damages claim currently has a minimum value of $63,000,000.00. The damages Richard has suffered are not grounds for dismissal.

**IV.     Defendants' Claims for Breach of Contract between RMC and RCI and Unjust Enrichment Are Permissible Based on the Legal Doctrines of Alter Ego and Shareholder Oppression.**

Both RMC and RCI are closely held corporations so that, under Shareholder Oppression, Richard can file personal claims directly against the Ric-Man companies. MCL 450.1489. Additionally, as the Defendants mentioned in the Counterclaim, Steven controls all of the Ric-Man companies, which are essentially a single company with multiple branches (or alter egos) created to enable Steven to allocate and hide operating losses amongst the various companies, to shift payroll amongst the various companies, and to obtain local preference advantages in Government municipal contracts.

> Under Michigan law, a veil piercing request must meet the following criteria:
>
> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the plaintiff.

*SCD Chemical Distributors, Inc v. Medley*, 203 Mich. App. 374, 381 (1994) (citations omitted). The facts of each case guide these decisions. *Foodland Distributors v. Al-Naimi*, 220 Mich. App. 453, 456 (1996).

Steven easily meets these requirements. The entities are Steven's tools for reaching outside Michigan into markets where RCI does not have a local, non-union labor force. Steven also takes advantage of the entities' existence to manipulate their

finances, as the Macomb County headquarters controls all financial matters for all the entities, manipulating the income statements and balance sheets of RCI, at the expense of RMC, to make RCI look financially healthier to deceive RCI's lenders, creditors and bonding company. It handles accounts payable and receivable for all entities and issues paychecks for all employees. In other words, there are no funds related to RCI or any of the other entities that do not pass through Steven's office at RCI's headquarters. Thus, not only is there no separation of the entities' finances, but Steven uses the financial structure to manipulate intercompany financial matters to benefit himself, including reducing the conglomerate's total tax obligations and other obligations that can be avoided by shifting funds within the entities.

Discovery will reveal how Steven controls and manipulates the entities. In addition, the total amount of damages resulting from this cause of action will be determined through discovery. Finally, the fact that Steven has actively concealed this information, and the precise extent to which he has injured Defendants through his illegal operation of the business, is not an appropriate basis for dismissing any cause of action.

## CONCLUSION

Based on the facts identified in the Counterclaim and the Argument above, Richard specifically requests that the Court deny Plaintiffs' Motion, order Plaintiffs to pay Defendants' costs and fees incurred in responding to the Motion, and grant Defendants all additional relief that is just and equitable.

Date: July 21, 2026

Respectfully submitted,
LIPPITT O'KEEFE PLLC
*Attorneys for Counter-Plaintiffs*

/s/ Alexander E. Blum
Alexander E. Blum (P74070)
370 E Maple Rd, 3rd Floor
Birmingham, MI 48009
248-646-8292

## CERTIFICATE OF SERVICE

The undersigned hereby states that on July 21, 2026, she filed the foregoing document electronically with the Clerk of the Court using this Court's electronic filing system which will provide electronic service to counsel of record.  I declare the above statement to be true to the best of my knowledge, information and belief.

*/s/ Alexis Nemeth*
Alexis Nemeth
Legal Assistant
370 E. Maple Rd., 3rd Floor
Birmingham, MI  48009
248-646-8292
anemeth@lippittokeefe.com

4900-4377-3119, v. 1                                                22